JRR 26 CV 2954

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Northern Division

| | |
|---|---|
| **JACKSON PHILLIP MOSLEY**<br>401 P STREET, NW,<br>WASHINGTON, DC 20001,<br><br>*Plaintiff,*<br><br>**v.**<br><br>**MILEONE AUTOGROUP, INC.**<br>(BALTIMORE COUNTY, MARYLAND)<br><br>**ATLANTIC AUTOMOTIVE CORP.**<br>(BALTIMORE COUNTY, MARYLAND)<br><br>**RUSSEL ROUTE FORTY WEST, LLC**<br>**d/b/a HERITAGE BODY SHOP**<br>(BALTIMORE COUNTY, MARYLAND)<br><br>**TISCHER AUTOPARK, INC.**<br>**d/b/a BMW OF SILVER SPRING**<br>(BALTIMORE COUNTY, MARYLAND)<br><br>**EDWARD JOSEPH PULS, JR.**<br>(CARROLL COUNTY, MARYLAND)<br><br><br>*Defendants.* | USDC- GREENBELT<br>'26 JUL 29 PM3:46<br><br>**CIVIL ACTION NO.**<br><br>1:26-cv-_____-_____<br><br><br>**MOSLEY v. MILEONE, et al.**<br><br><br>**JUDGE:** Hon._____<br><br><br>*JURY TRIAL DEMANDED* |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

1. This case is about a choice—a choice that destroyed an innocent man's life—made by people who knew better. Defendants operate one of the largest privately held automotive

enterprises in the United States—more than seventy dealerships across six states, an in-house legal department, and, upon information and belief, annual revenues exceeding one-half billion dollars—an enterprise of a size that carries, and is expected to carry, layered departments, defined approval authorities, and written standard operating procedures governing decisions far smaller than this one. When they came to believe a customer owed them $6,376.06 on a repair bill, they held a contract of their own drafting that gave them a civil collection remedy, and they employ, and have employed for nearly three decades, an in-house Maryland attorney whose profession exists to know the difference between a debt and a crime. Through that attorney, they chose to brand the customer a felon instead.

2. They chose it having done nothing first. In the months between the events and the oath, no one at this enterprise sent a demand letter. No one sent certified mail, engaged a process server, referred the account to collections, reported it to a credit bureau, or filed the civil action their own contract contemplated. No one reconciled their own books, asked their own affiliate whether payment had been tendered there at their own direction, or reviewed a single record capable of identifying who actually drove the car away. They did not even use the email address and mobile number their own intake form had captured for exactly this purpose. The most elementary diligence—the kind any corner shop performs before accusing a customer of theft, and the kind this enterprise's resources made effortless—was skipped in its entirety.

3. What they did instead was swear. On June 12, 2025, Defendant Edward J. Puls, Jr.—the enterprise's Corporate Counsel and Director of Security—raised his right hand before a District Court Commissioner and attested, under penalties of perjury, that he had "attempted to contact the Defendant and when no contact was able to be made, Mr. Puls began an

investigation of the matter." There had been no such effort and no such investigation. Nearly five months after the events it described, that application produced a felony warrant charging a man with no criminal record with theft. The warrant sat unserved for eight months while Defendants said nothing to him. Then it detonated.

4. Plaintiff was arrested twice. The first arrest came the day his grandfather suffered the stroke that killed him; Plaintiff spent that night in a cell instead of at a bedside, and never said goodbye. His insulin-dependent dog went roughly twenty-nine hours without a dose. The felony charge entered the public record, where it was found, published, and used to destroy him. His vendors saw a felony thief. His liquor licensing authority saw a felony thief. His business did not survive it. Neither did his finances; he is now a debtor in Chapter 13.

5. The recklessness is not a matter of characterization; it is documentary. Defendants' own intake form—Exhibit 1 to this Complaint—records the email address and mobile number Plaintiff supplied and preserves, in Plaintiff's own checked boxes, exactly how he asked to be reached. Puls's sworn application—Exhibit 2—sits beside it, attesting that contact could not be made. The two documents cannot both be true. Defendants wrote one and swore the other.

6. And when the criminal law failed them, Defendants revealed what it had been for. The State of Maryland declined to prosecute, the charge failing, in the State's own words, for "insufficient evidence." Five weeks later, Defendants sued Plaintiff in the District Court of Maryland for the identical $6,376.06. A creditor who wants a debt paid files suit. Defendants filed suit only after a felony charge failed to produce payment first.

7. This case asks a jury a narrow question: what does a half-billion-dollar enterprise owe a customer—one whose car was in its shop only because another driver hit him—before it asks the State to put him in handcuffs over a disputed repair bill? The answer cannot be nothing.

## I. PARTIES

8. Plaintiff Jackson Phillip Mosley is a natural person domiciled in, and a citizen of, the District of Columbia. He is a graduate of the American University Washington College of Law and, at all relevant times, had no criminal record of any kind.

9. Defendant Atlantic Automotive Corp. is a Maryland corporation (SDAT ID D02152395), principal place of business 1 Olympic Place, Suite 1200, Towson, Baltimore County, Maryland. It is a citizen of Maryland.

10. Defendant MileOne Autogroup, Inc. is a Maryland corporation (SDAT ID D22537245), principal place of business One Olympic Place, Suite 1200, Towson, Baltimore County, Maryland. It is a citizen of Maryland.

11. Defendant Russel Route Forty West, LLC is a Maryland limited liability company (SDAT ID W13584404), principal office 1 Olympic Place, Suite 1200, Towson, Baltimore County, Maryland, transacting business as "Heritage Body Shop." Its sole member is R&H Motor Cars, Ltd., a Maryland corporation (SDAT ID D00178491) with its principal place of business in Baltimore County, Maryland. Russel Route Forty West, LLC is therefore a citizen of Maryland.

12. Defendant Tischer Autopark, Inc. is a Maryland corporation (SDAT ID D01458009), principal place of business 1 Olympic Place, Suite 1200, Towson, Baltimore County,

Maryland. Upon information and belief, it transacts business as "BMW of Silver Spring" at 3131 Automobile Boulevard, Silver Spring, Montgomery County, Maryland. It is a citizen of Maryland.

13. Defendant Edward Joseph Puls, Jr. is a natural person domiciled in Carroll County, Maryland. He is an attorney licensed by the State of Maryland (Attorney Code 9306230274) and serves as Corporate Counsel and Director of Security for the enterprise described below. He signed and swore the Application for Statement of Charges personally.

14. The corporate Defendants share a single principal office, a common resident agent, common corporate counsel, and common officers. Public charter records reflect that on August 16, 2012, twenty-nine affiliated entities were relocated to 1 Olympic Place in a single filing, and that on February 12, 2014, ten more followed, including Russel Route Forty West, LLC and R&H Motor Cars, Ltd. They are referred to collectively as the "MileOne Defendants," and upon information and belief each acted as agent for the others in the matters alleged.

## II. JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different States. The District of Columbia is deemed a State for this purpose. 28 U.S.C. § 1332(e).

16. Complete diversity exists. Plaintiff is a citizen of the District of Columbia; every Defendant is a citizen of Maryland.

17. Venue is proper under 28 U.S.C. § 1391(b)(1) because all Defendants reside in Maryland, and under § 1391(b)(2) because a substantial part of the events and omissions occurred in Maryland. Assignment to the Northern Division is proper under Local Rule 501.4 because all Maryland parties reside in that division.

18. Plaintiff is a debtor in a case pending under Chapter 13 of the United States Bankruptcy Code, as alleged at Paragraph 75 below. A Chapter 13 debtor possesses standing, concurrent with that of the trustee, to maintain non-bankruptcy causes of action in his own name. Wilson v. Dollar Gen. Corp., 717 F.3d 337 (4th Cir. 2013).

### III. FACTUAL ALLEGATIONS

*A. Plaintiff entrusts his vehicle to Defendants.*

19. On October 29, 2024, Plaintiff delivered his 2023 BMW i4 M50, VIN WBY33AW06PFN4386, to BMW of Silver Spring for collision repair.

20. The vehicle was there because another driver had struck it. Plaintiff was not at fault in the collision, and the repairs were to be paid by the at-fault driver's carrier, Erie Insurance, under claim number A00006284073—the claim number Defendants themselves recorded on their intake form. Liability was clear enough that Plaintiff never opened a claim under his own policy at all; the repairs proceeded from the outset as a third-party claim against the carrier for the driver who caused the damage.

21. Erie did not pay what the repairs cost. It paid $2,093.52 against the first repair order and declined the second entirely, allocating a portion of the damage away from the claim and leaving a deficit of $6,376.06—the sum at the center of this case.

22. Plaintiff made a deliberate decision about that deficit. He could have disputed Erie's allocation, but litigating with an insurer over a repair bill would have cost more in time than the deficit itself. He chose to absorb it and pay Defendants rather than fight. That is the decision of a man resolved to pay a bill—not the state of mind of a man planning to steal one.

23. Plaintiff did not select any facility that touched his automobile. Erie Insurance directed him to bring the vehicle to the body shop at BMW of Silver Spring, and because the vehicle remained drivable after the collision, Plaintiff delivered it there himself. Left to his own choice, he would have used the BMW service location nearest his residence in the District. Every decision after that was Defendants' own: as Defendants allege in their own civil complaint, the manager at BMW of Silver Spring determined that the damage exceeded that location's capability and directed that the vehicle be transported to an affiliated body shop in Baltimore, and upon completion Defendants transported it back to Silver Spring. Plaintiff chose none of it. The Silver Spring location was also not convenient to him; he could reach it from his residence only by a substantial drive in traffic or by paid car service at roughly sixty dollars each way.

24. He signed a Work Authorization printed on a form bearing the MileOne corporate logo. The line reading "Body Shop/Repair Facility" was left blank. Nowhere does the document name Russel Route Forty West, LLC. A true and correct copy is attached as Exhibit 1.

25. On the face of that form, beneath "Preferred method of notification," Plaintiff marked two boxes: Email and Text. He supplied both his electronic mail address and his mobile telephone number, and Defendants recorded and retained them.

26. Defendants drafted the rest of the form. It provides that "[a]n express mechanic's/garageman's lien is hereby acknowledged on said vehicle to secure the amount of repairs thereto." It provides that upon notification of completion, the owner "will remove the vehicle from the body shop premises within 48 hours or daily storage fees, as permitted by law, will accrue." And it provides that if "the Shop commences collection proceedings against me for any amount due under this agreement," the owner will pay collection costs, interest, and "reasonable in-house or outside attorney's fees."

27. Two repair orders were issued, numbered 2087570 and 2094050. Erie Insurance paid part. Defendants say $6,376.06 remained.

28. The repairs took far longer than Defendants had quoted. Plaintiff delivered the vehicle in October 2024, and Defendants did not notify him that it was ready until December 3, 2024.

29. In December 2024, in the week before he retrieved the vehicle, Plaintiff wired his lender the full remaining balance on the automobile—approximately $45,000—extinguishing the note and taking clear title. A man who has just paid off a $45,000 automobile loan in a single wire transfer is not a man who then steals $6,376.06 in labor from the shop that repaired it.

**B. Defendant Russell Route Forty moves the car off their lot.**

30. When the work was finished, Defendants did not keep the vehicle. They loaded it onto a transport and moved it to BMW of Silver Spring—voluntarily surrendering the possessory lien their own contract had reserved.

31. They did not park it inside the gated service area. They left it in the public-facing lot typically designated as "Ready for Pickup" or the "Customer Lot."

32. And they left the key inside the car, in the cupholder.

### C. *Plaintiff pays and retrieves his own automobile.*

33. Plaintiff was, at the time, on a work assignment outside the United States that was extended more than once. He could not collect the vehicle on Defendants' schedule, and he told them so. Defendants understood the circumstances well enough to waive most of the storage charges that had accrued while the car sat—an accommodation reflecting both their knowledge of Plaintiff's situation and the ordinary courtesy of a business dealing with a customer rather than a suspect.

34. On the afternoon of Friday, January 24, 2025, Plaintiff telephoned the body shop. He explained that his schedule permitted him to come only in the late afternoon of Saturday, January 25—after the body shop would be closed. The man he spoke with, whose name Plaintiff cannot recall after the passage of more than a year, and whose identity lies within Defendants' records rather than Plaintiff's, proposed a solution.

35. The arrangement was this. The body shop would leave the invoice and the vehicle's key with the Mercedes-Benz dealership immediately adjacent to it—a separate building roughly two hundred feet away, under the same corporate ownership, and open until 6:00 p.m. on Saturdays. Plaintiff would present government-issued identification together with certified payment, and would receive the key in exchange. Certified funds were required, Plaintiff was told, because the Mercedes-Benz dealership's accounting systems were not connected to the body shop's, so a card payment could not be processed—but a certified instrument could simply be carried next door when the body shop opened on Monday.

36. This was an accommodation Defendants themselves proposed and extended to a customer whose vehicle had been ready for weeks. It may not have been their routine practice. That is precisely the point: Defendants departed from routine to help Plaintiff, and then treated the consequences of their own departure as evidence of his criminality.

37. On Saturday, January 25, 2025, Plaintiff went to the Mercedes-Benz dealership exactly as arranged. He presented his government-issued identification. He paid in full with six United States Postal Service money orders—six because federal postal money orders are capped at $1,000 apiece—and handed them to a staff member there, precisely as Defendants had instructed him to do.

38. The invoice was waiting for him. The key was not. Upon information and belief, whoever moved the vehicle from the body shop to the adjacent lot delivered the paperwork but neglected to deliver the key with it, leaving it where a transport driver would place it during transport—inside the car with the service tag still attached to the keychain.

39. The representative then tried to find the key to no avail. Plaintiff went to the vehicle and found that the car was locked, but the key had been mistakenly left in the cupholder. He informed the Mercedes-Benz representative, and they recommended calling a locksmith that they regularly used, retaining the receipt, and getting reimbursed later. He paid for a locksmith's "roll fee" out of his own pocket and waited over an hour in the customer lounge for him to arrive.

40. The locksmith—driving the "white van" Defendants would later describe to a Commissioner as though it were evidence of a crime—arrived and said he could not open the car without permanently damaging its frameless windows.

41. At the locksmith's suggestion, Plaintiff telephoned BMW and had his own vehicle unlocked remotely, through the manufacturer's connected services, using his own account, in his own name. Plaintiff had forgotten about the connected services features. He took the key out of the cupholder and drove home in the car he owned.

42. What BMW's connected services can do is send an unlock signal. What they cannot do is start an automobile or permit one to be driven away. For the vehicle to move, its key had to be physically inside it—and it was, because Defendants had left it there. The very fact Defendants would later characterize as theft is proof that Defendants themselves had put the key in the car.

43. No one steals a car by calling the manufacturer's customer service line from a registered account in his own name and asking them to open the doors.

44. Three days later Plaintiff traded that vehicle at a BMW dealership in Virginia Beach toward a substantially more expensive BMW. He was not short of money. He had no earthly reason to steal $6,376.06 in labor.

45. That transaction, too, was accommodated around Plaintiff's schedule rather than performed at his convenience. The sales manager and sales associate in Virginia Beach remained at the dealership until approximately 11:00 p.m. so that Plaintiff could make the drive and complete the paperwork after his day ended. And because Plaintiff had only recently received the physical title from the District of Columbia after paying the automobile off, and had accidentally left it in a stack of mail at home, the dealership dispatched an employee days later to deliver the new vehicle and collect the traded automobile and its title. The same

schedule that prevented Plaintiff from collecting his car during business hours governed every part of these events.

### D. What Defendants knew, and what they did not do.

46. Defendants possessed Plaintiff's electronic mail address. They sent no email.

47. Defendants possessed Plaintiff's mobile number and had used it successfully in December 2024. They sent no text and left no voicemail.

48. Defendants possessed Plaintiff's home address, printed on Exhibit 1. They sent no demand letter and no certified mail.

49. Defendants never engaged a process server or skiptracer to locate Plaintiff. They never referred the account to a collection agency. They never reported it to any consumer reporting agency. They never filed the collection action their own contract expressly contemplated.

50. They never asked the staff at the Mercedes-Benz dealership—an affiliate a few hundred feet from their own building—whether a customer had tendered six money orders.

51. They never reconciled their own books across affiliated entities under common ownership.

52. They never reviewed video that identified anyone. They had none. To this day their own pleading concedes that "an unknown person" took the vehicle.

### E. The road any professional business takes—and Defendants did not.

53. When a commercial enterprise believes a customer owes it money, the ordinary and expected course is well known and unremarkable: a telephone call, an email, an invoice, a written

demand, a certified letter, a final notice, a referral to collections, and—if all of that fails—a civil suit. Criminal process is not a debt-collection tool, and every step of the ordinary course exists precisely to ensure the alleged debtor knows there is a dispute before anything escalates.

54. Upon information and belief, Defendants generate annual revenues in excess of one-half billion dollars, operate more than seventy dealerships across six states, and maintain a dedicated in-house legal department.

55. An enterprise of that scale does not lack the means to send an email. It does not lack the means to mail a letter. It does not lack the means to walk next door. It has written policies, trained staff, and counsel on salary for exactly this purpose.

56. Defendants skipped all of it.

57. Upon information and belief, the most ordinary explanation for the money Defendants say they never received is the one Defendants never looked for: a staff member at the Mercedes-Benz dealership, handed six certified instruments across a counter on a Saturday, routed them to that dealership's own accounting office rather than carrying them next door on Monday, as the arrangement contemplated.

58. Defendants' delay destroyed the proof. The United States Postal Service retains images of negotiated money orders for approximately two years, but retains purchase and inquiry data for only about six months. Had Defendants sent a demand letter, an email, a text message, or any other notice within any reasonable period, Plaintiff could have traced six certified instruments to the account that deposited them and this dispute would have ended there. By February 2026, when Plaintiff first learned of the accusation only *after* being arrested for it,

the purchase records were gone—from his files and from the Postal Service alike. Defendants' silence did not merely delay the truth. It consumed the evidence, and Defendants now ask a court to hold the absence of that evidence against the man whose ability to preserve it they destroyed.

59. The gap between report and oath makes the omissions incurable. Defendants placed the matter in the hands of the Montgomery County Police—Officer Agulara's report, No. 2500005128, is invoked in the Application itself—in or about late January or February 2025, upon information and belief. Puls did not swear the Application until June 12, 2025. For those months, with the matter already in police hands and nothing left to "investigate" but their own records, Defendants still sent Plaintiff no email, no text, no letter, no voicemail, and no demand. Whatever urgency might excuse a rushed accusation, Defendants had none; whatever diligence months permit, Defendants performed none.

### F. A lawyer chooses the criminal law.

60. On June 12, 2025, Defendant Puls signed, under penalties of perjury, an Application for Statement of Charges before a District Court Commissioner in Montgomery County. A true and correct copy is attached as Exhibit 2.

61. Puls is not a service writer, a salesman, or a dealership employee who wandered into a courthouse. He is a member of the Maryland Bar, and he has served as Corporate Counsel to this enterprise for more than twenty-eight years. He knew the difference between a civil collection action and a felony charge. He held, in his own company's files, a contract reserving the civil remedy. He chose the other one.

62. Puls's tenure forecloses the excuse that would otherwise be available to his employers. A lawyer who has represented an organization for nearly thirty years does not misunderstand its procedures, its approval authorities, or its standards for escalating a customer dispute—he is the institutional memory of them. Whatever process this enterprise had for deciding when a disputed invoice becomes a criminal accusation, Puls knew it. Whatever process it lacked, he knew that too, and proceeded anyway.

63. Nor did Puls seek any check on his own judgment. Upon information and belief, before swearing out a felony warrant against a customer over $6,376.06, he consulted no outside counsel, obtained no second signature, and submitted the decision to no reviewing authority within the enterprise—fully bypassing the enterprise's Chief Legal Officer and General Counsel, Lisa Olivieri. He was inside counsel acting alone, and the enterprise permitted him to act alone.

64. Puls also stepped outside the role his employers gave him. Corporate counsel exists to handle an organization's civil and legal affairs. Upon information and belief, Puls served as a police detective decades before joining this enterprise, and in this matter he arrogated to himself the function of a criminal investigator—conducting what he termed an "investigation," gathering a private citizen's confidential records, and personally presenting a criminal accusation to a judicial officer. Whatever he learned as a detective a generation ago did not qualify him to substitute his own judgment for that of the trained investigators to whom criminal matters belong, and his employers had no business allowing him to try.

65. On the sworn Application, Puls identified himself as "Corporate Counsel and Director of Security." Upon information and belief, no such title appears in his professional record, his

public professional listings, or any public description of this enterprise's management. That a lawyer would attach an unverifiable title of authority to a sworn criminal accusation is of a piece with everything else about how this accusation was assembled.

66. In Exhibit 2 he swore that he "attempted to contact the Defendant and when no contact was able to be made, Mr. Puls began an investigation of the matter." That statement was false, and Puls knew it was false or made it with reckless disregard for whether it was true.

67. He swore further that Plaintiff "caused his vehicle to be removed from the lot without making payment"—stated as observed fact, by a man who was not there, about an event no Defendant could attribute to any identified person.

68. He omitted everything that mattered: that Defendants had given up possession voluntarily; that they had left the car unsecured with the key inside; that they had directed Plaintiff to pay at an affiliated dealership; that no one had used either notification channel Plaintiff designated; and that they had no image of Plaintiff anywhere.

69. A Commissioner, seeing only what Puls chose to show her, issued a warrant charging theft of $1,500 to under $25,000 under Md. Code, Crim. Law § 7-104—a felony punishable by five years' imprisonment. A true and correct copy is attached as Exhibit 3. On its face, the Application that produced it bears hand-struck and rewritten entries: the typed Baltimore location of the repairs is crossed out and replaced, by hand, with a Montgomery County address, and the facility name is likewise struck and rewritten—alterations to a sworn charging document that no initial acknowledges and no explanation accompanies.

### G. *Eight months of silence.*

70. Having obtained a felony warrant, Defendants told Plaintiff nothing. Not a letter, not a call, not an email. For approximately eight months the warrant sat in a law-enforcement database while Plaintiff went to work, ran his business, and had no idea it existed.

71. Every one of those days was a day Defendants could have picked up a telephone and ended this. They never did.

### H. *The first arrest—February 13, 2026.*

72. On February 13, 2026, Plaintiff was arrested in the District of Columbia by agents of the United States Diplomatic Security Service as a fugitive from justice. He was given no meaningful explanation. He had never been served, never summoned, and never told a charge existed. The arrest was procured by an adversary of Plaintiff seeking to defame him, using a weapon Defendants placed in his hand—a felony warrant.

73. That same morning, Plaintiff's grandfather suffered the stroke from which he died. Plaintiff spent the day and the night in custody. He was not at the hospital. He did not say goodbye. He will not have another chance.

74. At home, Plaintiff's insulin-dependent dog went approximately twenty-nine hours without a dose, because the person who administers it was in a cell.

75. He was held through the night in a cell for the underlying Maryland warrant that DC Metropolitan Police could not locate or materialize. Montgomery County was contacted; however, they informed DC MPD that the matter was of such low priority that they would

not seek extradition, but only after Plaintiff suffered in a jail cell for more than twenty-five hours.

76. Plaintiff alleges in a separate action that the third-party adversary located the Montgomery County warrant in the public record and procured its execution. That arrest was the result of a chit cashed in by that third party—called in to a friend within a law enforcement agency acting outside their operational bounds. The result was a highly public arrest more worthy of a serial killer than of some alleged theft of ~$6,000. That does not diminish these Defendants' responsibility—it depends on it. There was no warrant to find—and nothing to weaponize—until Defendants manufactured one. Defendants created the instrument; another used it. Plaintiff was a limited-purpose public figure—known for his business acumen, success, mentorship, and philanthropy. The arrest made news. Both are causes of everything that followed.

### I. The second arrest—March 2, 2026.

77. Compelled to answer a charge he first learned of by being handcuffed, Plaintiff surrendered himself in Montgomery County on March 2, 2026. He was arrested a second time, booked, photographed, and released on a $5,000 unsecured personal bond.

78. Only then—in March 2026, sixteen months after the repairs and nine months after the oath—did Plaintiff first see the Application for Statement of Charges and learn what Puls had sworn about him.

79. His booking photograph and the felony charge became publicly accessible records.

## J. *The State refuses to prosecute.*

80. On April 14, 2026, the State of Maryland, by Assistant State's Attorney Kaitlyn D. Wallace, filed a Line stating the grounds for abandoning the prosecution in a single sentence: "State will enter the charges nolle prosequi due to lack of jurisdiction and insufficient evidence." The nolle prosequi was entered on the record on April 16, 2026. A certified copy of the Circuit Court record of the nolle prosequi, under the seal of the Clerk, is attached as Exhibit 4.

81. Plaintiff was never tried and was never adjudged guilty of anything. The proceeding terminated in his favor without conviction. The nolle prosequi was not entered pursuant to any plea, agreement, or compromise; Plaintiff gave nothing and surrendered nothing to obtain it. But the damage had already been done—damage far exceeding the maximum punishment for the crime Defendants alleged had been committed.

82. Defendants never told anyone. They issued no correction and no retraction to any person who had learned of the charge.

## K. *Five weeks later, they sue for the same money.*

83. On May 22, 2026, Russel Route Forty West, LLC filed a civil action against Plaintiff in the District Court of Maryland for Montgomery County, No. D-06-CV-26-018268, demanding the identical $6,376.06. A true and correct copy is attached as Exhibit 5. The filing itself bespeaks the care behind it: a pleading captioned an "Addendement [sic] to Complaint" that accompanies no original complaint to which anything could be added, verified on "personal knowledge" by an affiant who had none. These defects are not rhetoric; they are evidence—

the visible surface of the same absence of care that produced a felony charge without an investigation.

84. That complaint repeats the same falsehood—that Defendants "attempted to contact the Defendant with no response."

85. It alleges at paragraph 5 that "an unknown person exited the van walked to the VEHICLE, opened it and drove away," and then asserts at paragraph 7 that "the Defendant wrongfully had his VEHICLE removed from the premises." Defendants concede they do not know who took the car and swear it was Plaintiff in the same document.

86. The supporting affidavit is signed under penalties of perjury, "upon personal knowledge," by a Senior Claims Supervisor who was not present at BMW of Silver Spring on January 25, 2025, and who cannot possibly know what she swore to.

87. Defendants thus demonstrated, by their own hand, that this was always a collection matter. They tried the criminal law first because it was faster and it hurt more. And when the criminal law failed, Defendants did not stop. Their civil complaint repleads the very fact pattern the State had just abandoned as unsupported by the "evidence"—the same unknown driver, the same unexamined books, the same false claim of attempted contact. Defendants could have accepted the dismissal and closed their file. They doubled down on it instead.

## IV. DAMAGES

88. Plaintiff was arrested twice, held in custody, handcuffed, transported, booked, fingerprinted, and photographed. He was subjected to a felony accusation carrying five years'

imprisonment, required to post bond, and required to defend himself for more than two months.

89. Plaintiff lost the last hours of his grandfather's life. That loss is permanent, it is not compensable by any sum that will restore it, and it happened because Defendants would not send an email.

90. Plaintiff's insulin-dependent dog was left without medication for approximately twenty-nine hours while Plaintiff was in custody.

91. Plaintiff was the owner and operator of a hospitality business in the District of Columbia. A felony theft charge against its principal is disqualifying in that industry.

92. Vendors, suppliers, partners, lenders, and counterparties learned that Plaintiff stood charged with felony theft. Alcoholic beverage licensing in the District of Columbia turns on the good character of the licensee, and Plaintiff was the licensee's sole controlling principal and its designated representative before the Board. Plaintiff's venture—Rainbow Zebra, LLC, trading as RUSH, at 2001 14th Street, NW—held an application for a Retailer's Class "C" Tavern license, ABRA-134289, which the Alcoholic Beverage Control Board had reviewed and approved on October 22, 2025, with issuance pending only routine administrative contingencies. A true and correct copy of the Board's contingency letter is attached as Exhibit 6.

93. The business did not survive. Plaintiff lost the enterprise he built, the income it produced, and the professional standing that came with it.

94. The destruction of Plaintiff's business and professional standing destroyed his finances. Plaintiff, along with his husband—left with no other choice to defend their real estate and few remaining assets—filed a petition under Chapter 13 of the United States Bankruptcy Code on April 17, 2026, two days after the State abandoned the charge that started it.

95. He carries the credit consequences of that filing and will for seven years.

96. The felony charge, the arrest, and the booking photograph entered publicly accessible records. It was foreseeable—indeed inevitable—that a public criminal charge would be found and repeated. It was found, and it was repeated, and Plaintiff's name is now attached to an accusation of theft that the State of Maryland refused to prosecute.

97. While Plaintiff is not a practicing attorney, he is a juris doctor. His professional reputation is his livelihood.

98. The arrest record now stands between Plaintiff and the professional life he built toward. Plaintiff earned his juris doctor and chose a career outside the courtroom; should he ever elect to sit for a bar examination, the arrests are matters he must disclose and explain to a character and fitness committee that otherwise would have had no question to ask. His fingerprints and booking photographs have been entered into state and federal criminal-justice databases, where they remain. And in the national capital region—the part of the country with the highest concentration of federal employment—background investigations and security clearances are the currency of professional life. The arrests have made such clearances, and the employment that depends on them, measurably harder to obtain and to maintain: every background investigation now opens with two arrests on a felony charge the State refused to prosecute, and with Plaintiff's burden of explaining them.

99. Maryland offered Plaintiff a faster way out—at a price. To petition for early expungement of the nolle prossed charge, Plaintiff was required to execute a General Waiver and Release of every claim arising from the charge, in favor of every person connected with it—including the Defendants here. Md. Code Ann., Crim. Proc. § 10-105; Form CC-DC-CR-078. Plaintiff declined to purchase a clean record with a release of Defendants' liability. The record therefore stands until expungement arrives by operation of law years from now, and with it stands the burden of explanation—a burden Defendants created, and one that Maryland law priced against Plaintiff's right to be heard in this Court.

## V. CLAIMS FOR RELIEF

### COUNT I—MALICIOUS PROSECUTION
#### (All Defendants)

100. Plaintiff realleges and incorporates by reference paragraphs 1 through 99 as though fully set forth herein.

101. Defendants instituted a criminal proceeding against Plaintiff. Puls personally signed and swore the Application—he did not merely report a suspicion and leave the charging decision to independent official judgment. Each corporate Defendant participated in the institution or continuation of the proceeding by supplying, authorizing, or ratifying the information on which the Application rested—including the assertion, repeated in Defendants' own later pleading, that BMW of Silver Spring had "attempted to contact the Defendant," which was false.

102. The proceeding terminated in Plaintiff's favor without conviction.

103. Defendants acted without probable cause. A belief formed after no inquiry of any kind is not an objectively reasonable belief. Defendants checked no ledger, called no affiliate, sent no notice, reviewed no identifying evidence, and possessed no image of Plaintiff. Their own pleading concedes the actor was unknown to them. The State's own stated ground for abandoning the prosecution—insufficient evidence—corroborates what Defendants' records established from the outset.

104. Defendants acted with malice, which may be inferred from the absence of probable cause. Their purpose was not to bring an offender to justice but to collect a disputed commercial debt—as their civil action for the identical sum, filed five weeks after the charge failed, establishes. Maryland's highest court has sustained precisely this claim in precisely this posture—a merchant that procured criminal charges against its own customer—affirming the customer's compensatory judgment and confirming that malice may be inferred from the want of probable cause. Montgomery Ward v. Wilson, 339 Md. 701, 664 A.2d 916 (1995).

105. Defendants acted recklessly and in conscious disregard of Plaintiff's rights. In the alternative, they acted knowingly and with actual malice.

106. The MileOne Defendants are liable under respondeat superior, Puls having acted within the scope of his employment and with their knowledge, authorization, and ratification.

### COUNT II—ABUSE OF PROCESS
#### (All Defendants)

107. Plaintiff realleges and incorporates by reference paragraphs 1 through 106 as though fully set forth herein.

108. Defendants willfully employed criminal process for a collateral objective improper in the regular conduct of a criminal proceeding: the collection of a disputed civil debt for which their own written agreement reserved a collection remedy.

109. After the warrant issued, Defendants made willful use of it for that collateral objective: they held it over Plaintiff for approximately eight months while making no attempt at notice, allowed it to be executed, and, upon the failure of the criminal case, immediately pursued the identical sum civilly.

110. Plaintiff suffered the special injury Maryland requires: arrest of the person, twice, and the posting of bond.

### COUNT III—NEGLIGENT SUPERVISION AND RETENTION
### (MileOne Defendants)

111. Plaintiff realleges and incorporates by reference paragraphs 1 through 110 as though fully set forth herein.

112. The MileOne Defendants owed a duty of reasonable care in hiring, training, supervising, and retaining employees entrusted with receiving customer payments, maintaining custody of customer vehicles and keys, reconciling accounts across affiliated entities, and invoking criminal process against customers.

113. They breached it: no procedure required verification of internal records before a criminal charge was sworn; no one reconciled a payment tendered at an affiliate at their own direction; no one safeguarded the vehicle or its keys; and a felony charge issued on facts no employee had verified. The written work product of that delegation—sworn documents bearing hand-struck venue, unexplained interlineations, and self-contradiction on their

face—is itself evidence of the absence of the supervision, training, and review this Count alleges. Above all, the MileOne Defendants vested a single inside lawyer with unreviewed authority to invoke the criminal law against a customer—no second signature, no review by any superior or by the legal department, no referral to outside counsel, and no written standard governing when a disputed invoice may be converted into a felony accusation. An enterprise of this size does not leave decisions of this magnitude to one person acting alone, and this one did.

114. The breach is aggravated by scale. An enterprise operating more than seventy dealerships with in-house counsel and layered internal approvals possessed every resource necessary to check itself and used none.

## COUNT IV—DEFAMATION
### (All Defendants)

115. Plaintiff realleges and incorporates by reference paragraphs 1 through 114 as though fully set forth herein.

116. Defendants published false and defamatory statements of and concerning Plaintiff, including the written assertions in Exhibit 2 that Plaintiff stole $6,376.06 in services and that Defendants had been unable to reach him. Puls swore that he "confirmed the sale and is in receipt of the sales documents"—Plaintiff's private purchase and trade records, held by a Virginia dealership that was a stranger to every Defendant. Upon information and belief, Puls obtained those confidential records by communicating his theft accusation to that dealership's personnel: no dealer surrenders a customer's private sale file to an unknown caller without being given a reason, and the only reason Puls had to give was the accusation

itself. That communication, made outside any judicial proceeding, was an unprivileged publication.

117. The statements charged Plaintiff with a crime and are defamatory per se.

118. Defendants published them knowing they were false or with reckless disregard for their truth, forfeiting any qualified privilege. No absolute privilege shields the Application: it was an ex parte submission to a judicial officer—a setting that is "not adversarial; nor is it an engine for the discovery of truth," where the judicial officer hears only the applicant—and Maryland's highest court has held that such submissions receive qualified protection only. Smith v. Danielczyk, 400 Md. 98, 928 A.2d 795 (2007). The Application's accusations entered publicly accessible records, and their republication to employers, licensors, and the public was the natural and foreseeable consequence of that publication, for which the original publishers remain liable.

119. Plaintiff first learned of the charge upon his arrest on February 13, 2026, and first saw the statements upon surrendering in Maryland in March 2026. This action is brought within one year of accrual.

### COUNT V—MARYLAND CONSUMER DEBT COLLECTION ACT
### (All Defendants)

120. Plaintiff realleges and incorporates by reference paragraphs 1 through 119 as though fully set forth herein.

121. The repairs were a consumer transaction: Plaintiff sought services for personal, family, or household purposes. Defendants are collectors within the meaning of § 14-201(b), which reaches original creditors.

122. In attempting to collect the alleged debt, Defendants violated § 14-202(8) by claiming, attempting, and threatening to enforce a right with knowledge that the right did not exist—Plaintiff having paid in full—and by employing criminal process to compel payment of a disputed consumer obligation. Maryland rejects any distinction between the "methods" of collection and the "amounts" sought: § 14-202(8) reaches any claim of a right that the collector knows—or recklessly disregards—does not exist. Newsom v. Brock & Scott, PLLC, 264 A.3d 283 (Md. Ct. Spec. App. 2021). Nor did Defendants merely threaten criminal prosecution in aid of collection, conduct that § 14-202(2) itself forbids; they procured it.

123. Section 14-203 makes Defendants liable for all damages proximately caused, expressly including damages for emotional distress and mental anguish suffered with or without accompanying physical injury.

### COUNT VI—MARYLAND CONSUMER PROTECTION ACT
### (All Defendants)

124. Plaintiff realleges and incorporates by reference paragraphs 1 through 123 as though fully set forth herein.

125. Defendants' violations of the Maryland Consumer Debt Collection Act constitute unfair or deceptive trade practices under § 13-301(14)(iii).

126. Plaintiff is a consumer who suffered actual injury and loss as a result, and brings this claim under § 13-408.

### COUNT VII—UNJUST ENRICHMENT (Pleaded in the Alternative)
### (MileOne Defendants)

127. Plaintiff realleges and incorporates by reference paragraphs 1 through 126 as though fully set forth herein.

128. Pleaded in the alternative to the foregoing and as a measure of relief: Plaintiff conferred a benefit on Defendants by tendering six United States Postal Service money orders in satisfaction of the invoices.

129. Defendants appreciated that benefit and, upon information and belief, retained it while simultaneously demanding the same sum from Plaintiff by criminal process and then by civil action.

130. Retention of that benefit under these circumstances is inequitable. Plaintiff seeks restitution and an accounting.

### COUNT VIII—FALSE LIGHT INVASION OF PRIVACY
### (All Defendants)

131. Plaintiff realleges and incorporates by reference paragraphs 1 through 130 as though fully set forth herein.

132. Defendants gave publicity to matters placing Plaintiff before the public in a false light—as a person who stole services and evaded his creditors.

133. The false light would be highly offensive to a reasonable person.

134. Defendants acted with knowledge of, or reckless disregard for, the falsity of the publicized matter and the false light in which Plaintiff would be placed.

## COUNT IX—INVASION OF PRIVACY: INTRUSION UPON SECLUSION
### (Defendant Puls; MileOne Defendants by Respondeat Superior)

135. Plaintiff realleges and incorporates by reference paragraphs 1 through 134 as though fully set forth herein.

136. Plaintiff's vehicle purchase, trade-in, and financing records held by the Virginia dealership were private papers reflecting private financial affairs, maintained in confidence and not available to the public.

137. Upon information and belief, Defendant Puls intentionally intruded upon that seclusion by procuring those records from a dealership with which no Defendant had any relationship— without Plaintiff's consent, without subpoena or other lawful process, and by misrepresenting his authority or purpose to obtain them.

138. The intrusion—a stranger's extraction of a consumer's confidential purchase and financing file on the strength of an accusation of crime—would be highly offensive to a reasonable person.

139. The MileOne Defendants are liable for the intrusion under respondeat superior. Plaintiff was damaged by it, including through the use of the intruded-upon records to procure and to sustain the felony charge against him.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jackson P. Mosley respectfully requests that this Court:

A.    Enter judgment against Defendants, jointly and severally, on each Count;

B.    Award compensatory damages of not less than Ten Million Dollars ($10,000,000.00), including damages for loss of liberty, emotional distress and mental anguish, injury to reputation, loss of business and business opportunity, lost income and earning capacity, and out-of-pocket loss, in an amount to be proven at trial;

C.    Award statutory damages under Md. Code, Com. Law §§ 14-203 and 13-408, together with court costs, filing fees, and litigation expenses as permitted by § 13-408;

D.    Award restitution and an accounting on Count VII;

E.    Award punitive damages against each Defendant sufficient to punish and to deter an enterprise of Defendants' size from doing this to anyone else;

F.    Award pre- and post-judgment interest and costs of suit; and

G.    Grant such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable. Fed. R. Civ. P. 38(b).

July 28, 2026

Respectfully submitted,

Jackson Phillip Mosley, JD, MBA
Plaintiff Pro Se
401 P Street, NW
Washington, DC 20001
(703) 395-1596
jacksonphillipmosley@gmail.com